564 P.2d 1238

**The STATE of Arizona, Appellee,**

v.

**Jeannie Louise HOLSINGER, Appellant.**

No. 3440.

Supreme Court of Arizona, In Banc.

April 14, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Thomas G. Bakker, Asst. Attys. Gen., Phoenix, for appellee.

Louis A. Moore, Jr., Phoenix, for appellant.

CAMERON, Chief Justice.

This is an appeal from verdicts and judgments of guilt to the crimes of murder in the first degree, A.R.S. §§ 13–451, –452, –453, –454 and A.R.S. §§ 13–138, –139, –140, with a sentence thereon of life imprisonment without possibility of parole until the completion of 25 calendar years; conspiracy in the first degree, A.R.S. § 13–331(A), with a sentence thereon of not less than 14 nor more than 15 years imprisonment; burglary, first degree, A.R.S. §§ 13–301, –302 and A.R.S. §§ 13–138, –139, –140, with a sentence of not less than 14 nor more than 15 years imprisonment; and conspiracy, second degree, A.R.S. § 13–331(B), with a sentence thereon of not less than 3 nor more than 4 years imprisonment. This is a companion case to *State v. Holsinger,* 115

Ariz. 89, 563 P.2d 888, No. 3402, filed this day.

The defendant raises numerous questions for consideration, but we feel that the answer to one will be dispositive of the appeal: Was it error for the prosecution to fail to disclose to the defendant the grant of immunity to one of the State's key witnesses?

The defendant, Jeannie Louise Holsinger, was the wife of Wilmar Goodwin Holsinger and the daughter of Golda B. Horton. Mrs. Horton was a longtime friend of Dr. Harry Schornick, an elderly semi-retired physician. Dr. Schornick and Mrs. Horton held a $24,-700 certificate of deposit in joint tenancy with right of survivorship. The State contended that this fact explains the motive since if Dr. Schornick were eliminated, the certificate of deposit became the sole property of the mother and eventually the daughter's.

In the spring of 1975, defendant's husband contacted Gary Cagnina and asked him if he could kill Dr. Schornick. Cagnina testified that he did not wish to do so, but that he would be willing to enlist the aid of others. Tim Anderson was approached and he refused. Wade Arnold was recruited by Cagnina and on the evening of 31 May 1975 went with Cagnina to break into Dr. Schornick's house. Three attempts were made to get into the house without success. Finally, in the early morning hours of 1 June 1975, Wade Arnold entered the house by prying one of the doors open with a crowbar. Six shots were fired killing Theresa Bortz, Dr. Schornick's housekeeper of many years and wounding Dr. Schornick. Cagnina and Arnold left immediately and called the Holsingers. Later that day, Cagnina was given $750 by Wilmar Holsinger and told to get out of town for a month. About a month later they returned and Wilmar Holsinger transferred his automobile to Cagnina and gave him $400 as well.

The defendant in her notice of defenses filed 6 October 1975, asked for "any other information which would tend to inculpate or exculpate the above named Defendant."

On the omnibus form the defendant asked for "Brady materials."

Prior to trial the files in the matter of Wilmar Goodwin Holsinger had been made available to the defendant. The file at that time contained a letter dated 18 August 1975 from the office of the Chief of Police of the City of Phoenix concerning Sue Simmons who had testified at the preliminary hearing:

"Moise Berger, County Attorney
Maricopa County
101 West Jefferson
Phoenix, Arizona 85003
            Re: D.R. 75–055170
"Dear Sir:

"Sue Simmons, White Female, 30 years, had knowledge of the Homicide of Theresa Bortz which occurred on June 1, 1975.

"Sue Simmons' testimony in court has helped the state in prosecuting the case against Wilmar & Jeannie Holsinger, and Gary Cagnina.

"In view of the situation and our desire to see the Holsingers and Cagnina prosecuted, we have no desire to have any charges filed against Sue Simmons in this case.

"Sincerely,
LAWRENCE M. WETZEL
Police Chief
/s/ H. B. Neal
H. B. NEAL,
Acting Police Chief"

After the defendant had the opportunity to review the files, the following letter was placed in the file:

"December 10, 1975
"Mrs. Sue Simmons
16820 N. 44th Street
Phoenix, Arizona 85032
"Re: State v. Jeannie and Wilmar Holsinger Cause # 89323 and 89341 and James Arnold 89590
"Dear Mrs. Simmons:

"This is to confirm that the County Attorney's Office extends full and complete immunity from prosecution to you for any matter or thing arising out of his testimony at the trial of any of the above referenced causes.

Sincerely,

MOISE BERGER
MARICOPA COUNTY ATTORNEY

/s/ Eddie L. Morgan
    for George Mount
George B. Mount
Deputy County Attorney"

During the trial but before the presentation of the State's case, the following transpired:

"MR. MOORE: I might ask the County Attorney: Do you have any further *Brady* materials which I am not aware of?

"MR. NEIL: No. I have given Bud notice that I am calling a Tom Bentley, manager of the Valley National Bank, and I am filing written notice at this time. And I will give that to you, Carol. I have got it.

"MR. MOORE: Also the Record should reflect that I have an additional witness. It is a Japanese name, Yoshioka or something like that, which I will put in the mail to you today. Also there may be a couple other additional witnesses which I may call. It depends on, obviously, what they say."

The testimony of Sue Simmons at the trial of the defendant indicated that on 1 June, Jeannie Holsinger came to her in the early afternoon and asked that she cash a check in the amount of $300. Sue Simmons' testimony also indicated that on two occasions prior to this, some nine to ten months before, she, Holsinger, had suggested to Simmons that Dr. Schornick should be killed if she could find somebody to do it.

This testimony was vital to the State since it was the only testimony to corroborate the testimony of the accomplices. This testimony was necessary under the statute in effect at that time, A.R.S. § 13–136.

True, Tim Anderson was not an accomplice, but while he connected defendant's husband to the crime, he did not connect the defendant and as to his testimony did not corroborate the testimony of the admitted accomplices.

It was not until after the trial that defendant learned that Sue Simmons had been granted immunity. At the hearing on the motion for new trial the attorney for defendant stated:

"The County Attorney's position, as I thought it was, was an open file policy in which I believe. But he had indicated to me that he had given me everything. I had no idea that Sue Simmons was granted immunity, nor did I have any reason to believe that she was granted immunity.

"So basically what happened on October 16th was the fact that Gene says, 'Bud, you are welcome to look through the file;' but since he had told me that I already had all the information, obviously that wasn't necessary. And I just told Gene, 'How can we get copies of the tapes?'

"'That's by going to D.P.S. and having them recopy it and get the pictures.'

"And that is my recollection of what happened on October 16th. I had never seen those exhibits which I have indicated and had no idea that Sue Simmons was granted immunity until our conversation on the phone after Jeannie's trial."

And Sue Simmons testified on examination by defendant's attorney as follows:

"Q And when I talked to you on the 6th, you didn't volunteer that you were given a letter of immunity?

"A I didn't have a letter of immunity at that time.

"Q On the 6th of January?

"A Oh, you are talking about the 6th of January. I thought you were talking about September. No, sir, you did not ask me if I had a letter of immunity at that time.

"Q But you did not voluntarily tell me that, did you?

"A No, I didn't voluntarily tell you.

"Q In fact, the first time I talked to you about the letter of immunity was sometime after Jeannie's trial when Greg Martin and I talked to you on the phone; is that correct?

"A That's correct."

Rule 15.1(a)(7) of the Rules of Criminal Procedure (1973), requires the prosecution to provide "all material or information which tends to mitigate or negate the defendant's guilt as to the offense charged * * *," and 15.6 imposes a continuing duty to disclose. As the Comment to Rule 15.1(a)(7) points out, this rule reads *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) into the Arizona Rules of Criminal Procedure providing that such information shall be disclosed prior to trial. Evidence of immunity would certainly be of aid to the defense and would tend to negate guilt by questioning the credibility of a key witness for the State. The United States Supreme Court has stated:

> "[E]vidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it." *Giglio v. United States*, 405 U.S. 150, 155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 (1972).

Evidence of the grant of immunity would have been helpful to the defendant in raising the credibility of the witness, but also for another reason. Sue Simmons' testimony was vital. She was the only witness that tended to corroborate the testimony of the accomplice. If Sue Simmons was an accomplice for which immunity had been granted in return for her testimony, then a conviction could not have been obtained because it would have been based upon the testimony of an accomplice alone. The fact of immunity was, then, doubly important to defendant; first to test the witness's credibility and second to determine if she was an accomplice.

The State, however, points out that at the hearing Sue Simmons testified as follows:

"Q Would you tell us why you asked for that letter of immunity?

"A I asked for the letter of immunity because I was not represented by an attorney. And I believe things can be twisted. And I felt for my own protection, I should have the letter of immunity.

\*　\*　\*　\*　\*　\*

"A I would have testified even without the letter of immunity. I would have asked for representation by an attorney at the time, but it would not have affected my testimony."

This is conjecture on the part of the witness and the prosecution. The fact of immunity was "*Brady* material" and the prosecution was obligated to provide it. It was error not to disclose this information and we cannot say that it was not prejudicial.

Reversed and remanded for a new trial.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.