601 P.2d 1054

**The STATE of Arizona, Appellee,**

v.

**Jeannie L. HOLSINGER, Appellant.**

**No. 3440–2.**

Supreme Court of Arizona, In Division.

Oct. 11, 1979.

John A. LaSota, Jr., Former Atty. Gen., Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Crane McClennan, Asst. Attys. Gen., Phoenix, for appellee.

Thinnes & Rawles by Thomas A. Thinnes, Thomas V. Rawles, Phoenix, for appellant.

CAMERON, Chief Justice.

Defendant Jeannie Louise Holsinger was adjudged guilty, after a jury trial, of first degree murder, A.R.S. §§ 13–451, 452, 453, 454, 138, 139 and 140; conspiracy to commit murder, A.R.S. § 13–331; burglary in the first degree, A.R.S. §§ 13–301, 302, 138, 139 and 140; and conspiracy in the second degree to commit burglary, A.R.S. §§ 13–301, 302 and 331.* She was sentenced to the following prison terms: 25 years to life for murder; 14 to 15 years each for the crimes of conspiracy to commit murder and first degree burglary; and 3 to 4 years for second degree conspiracy to commit burglary, the sentences to run concurrently. We have jurisdiction of this appeal pursuant to A.R.S. § 13–4031.

* Title 13 citations in this opinion are to the Arizona Criminal Code as it existed prior to its extensive revision effective 1 October 1978.

Although defendant raises five questions on appeal, we find it necessary to discuss only the following three:

I. Did the prosecutor's statement regarding defendant's "long criminal record" constitute reversible error?

II. Did certain questions asked by the prosecutor of the defendant on cross examination improperly infringe upon the attorney-client privilege and prejudice the defendant in the eyes of the jury?

III. Did certain questions asked by the prosecutor of the defendant regarding the availability of defendant's husband to testify violate the marital privilege and prejudice the defendant before the jury?

This case has previously been before this court. In the case of *State v. Holsinger,* 115 Ariz. 271, 564 P.2d 1238 (1977) we reversed the convictions of the defendant because of the failure of the prosecutor to provide certain information to the defense. The matter was remanded for retrial.

The evidence presented to the jury in this case showed that the defendant, Jeannie Holsinger, and her husband, "Buster" Holsinger, conspired to murder Dr. Harry Schornick. The doctor, a close friend of the defendant's mother had, from time to time, held large certificates of deposit with her as joint tenants with rights of survivorship. At the time of the attempt on his life, he held one such certificate in the sum of $24,700. The State argued that the defendant would ultimately inherit the money after Dr. Schornick's death.

The Holsingers allegedly enlisted Gary Cagnina to murder Dr. Schornick. Prior to the event, the Holsingers had discussions with Cagnina concerning the killing and the taking of certain items in the house. On 1 June 1975, Gary Cagnina and Wade Arnold went to Dr. Schornick's residence. Although the testimony was disputed as to who performed which acts, it is undisputed that the telephone lines were cut, the house was entered through the back door, Dr. Schornick was shot and wounded, and Dr. Schornick's housekeeper—Theresa Bortz—

was shot and killed. Payment was made by the Holsingers to Cagnina in the amount of $750. Later, Cagnina received the defendant's car and more money. At trial, Cagnina testified that this latter payment was not for the killing but for drugs. The State argued that it was for the killing.

From the defendant's convictions and judgments of guilt she appeals.

## I. DEFENDANT'S "LONG CRIMINAL RECORD"

■ Defendant initially contends that the prosecutor's question concerning defendant's "long criminal record" constitutes reversible error. We agree.

While questioning the State's key witness Gary Cagnina as to whether he, the prosecutor, was "out to get" the defendant, the prosecutor asked the following questions:

"Q Now during these coaching sessions, these 10 or 12 coaching sessions that we had between August and December 1975, did I tell you that I hated Jeannie Holsinger?

"A Not to my knowledge.

"Q Did I tell you that I wanted to get the bitch?

"A No, you didn't.

"Q Did I tell you—did anybody in my presence tell you that?

"A Not in your presence, no.

"Q Did I tell you that I wanted to nail Jeannie Holsinger?

"A I don't remember.

"Q Did I tell you that Jeannie Holsinger had a long criminal record and that's why I wanted to get her?"

Defense counsel immediately objected. The trial court sustained the objection, ordered the question stricken from the record, and instructed the jury to disregard it. Defendant contends that in spite of these remedial measures, the prosecutor's comments, which had no basis in fact, were so prejudicial as to require reversal.

We believe that the matter must be reversed for two reasons. First, assuming that the defendant did, in fact, have a long

criminal record, the question was both improper and highly prejudicial. Testimony regarding prior offenses may come into evidence only in certain circumstances. Rule 404(b), Arizona Rules of Evidence, 17A A.R.S. See *State v. Henderson,* 116 Ariz. 310, 569 P.2d 252 (App.1977); *State v. Moore,* 108 Ariz. 215, 495 P.2d 445 (1972).

In the instant case, no such circumstances were present: the prosecutor's question was not relevant under Rule 404(b); nor was it offered under Rule 404(a)(1) to impeach the defendant's character:

"It is well established in this jurisdiction that evidence of other crimes which the defendant may have committed is prejudicial and usually inadmissible. (citations omitted) Such evidence is excluded in order to avoid the danger that the jury's attention would be drawn away from the real issues of the trial and fasten its attention on other false issues. (citation omitted) Such evidence may also lead the jury to conclude that the defendant is a 'bad man' and convict him on that basis rather than on the basis of the evidence presented. (citation omitted)" *State v. Tostado,* 111 Ariz. 98, 100, 523 P.2d 795, 797 (1974).

The implication in the prosecutor's question was clear and prejudicial and could not be erased from the minds of the jury. Asking the question was reversible error.

There is, however, a second reason why the matter should be reversed. The prosecutor's question clearly implied that the defendant had a long criminal record when, in fact, she did not. This was improper conduct on the part of the prosecution. The American Bar Association's suggested standards for prosecutors states:

"5.7   Examination of witnesses.

 *      *      *      *      *      *

"(d) It is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner cannot support by evidence." American Bar Assoc. Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, § 5.7(d) (1971).

The Commentary to 5.7(d) states:

"d.   Unfounded question

"The attempt to communicate impressions by innuendo through questions which are answered in the negative, for example, 'Have you ever been convicted of the crime of robbery?' or 'Weren't you a member of the Communist Party?' or 'Did I tell Mr. X that . . . ?' when the questioner has no evidence to support the innuendo, is an improper tactic which has often been condemned by the courts. See, *e. g., Richardson v. United States,* 150 F.2d 58 (6th Cir. 1945); *People v. DiPaolo,* 355 [366] Mich. 394, 115 N.W.2d 78 (1962); *State v. Flowers,* 262 Minn. 164, 114 N.W.2d 78 (1962). See generally 6 Wigmore, Evidence § 1808(2) (1940). See also American College of Trial Lawyers, Code of Trial Conduct §§ 20(c), (d), (g) (1963)."

The vice of such type of questioning is apparent. By asking questions that have no basis in fact, the questioner can leave in the minds of the jurors all kinds of damaging and prejudicial but false or inadmissible facts, facts which can't be adequately rebutted by witness's testimony or instructions by the court. In the instant case, some if not all of the jurors, even though the judge instructed them to disregard the question, could still hold the opinion that the defendant had a long criminal record and therefore was probably guilty even if the facts admissible at trial might not have proven her guilt beyond a reasonable doubt. This court has stated, in an analogous though not identical fact situation:

"To allow this sort of examination would be to allow the imaginative and overzealous prosecutor to concoct a damaging line of examination which could leave with the jury the impression that defendant was anything that the questions, by innuendo, seemed to suggest. If the questions were persistent enough and cleverly enough framed, no amount of denial on the part of a defendant would be able to erase the impression in the

mind of the jury that the prosecutor actually had such facts at hand and that probably there was some truth to the insinuations." *State v. Singleton,* 66 Ariz. 49, 65, 182 P.2d 920, 930 (1947).

The question was prejudicial and the prosecutor's conduct improper. The judgment must be reversed and the matter again remanded for a new trial.

## II. ATTORNEY–CLIENT PRIVILEGE

Defendant next contends that certain questions asked by the prosecutor on cross examination improperly infringed upon the attorney-client privilege and thereby prejudiced her in the eyes of the jury. Defendant's allegations of prejudicial error in regard to the attorney-client privilege stem from the following series of questions asked by the prosecutor:

"Q [H]ave you discussed the case with [your] two attorneys?

"A Yes.

"Q And on how many occasions have you discussed the case with them?

"A Three times.

"Q Three separate times?

"A That's right.

"Q And where were those three separate times?

"A One was last Sunday. One, I believe, was the Sunday before. And I cannot pinpoint the month, but I believe it was when I retained them, or shortly thereafter.

"Q And except for those three occasions you've never talked to either one of them about the case?

"A I have talked to them outside of the court, Mr. Mount. A couple of times I have called them on the phone or they have called me.

"Q Was that during trial or before trial that they called you?

"A I believe it was before trial.

\*   \*   \*   \*   \*   \*

"Q Have they ever discussed the case that the State had against you?

"MR. RAWLES: Your Honor, object at this time on the basis of privilege as to what we may or may not have discussed with this individual.

"THE COURT: The privilege belongs to the witness.

BY MR. MOUNT:

"Q Would you like to invoke the privilege at this time?"

The attorney-client privilege, A.R.S. § 13–4062(2), belongs to the client and concerns communications between the attorney and the client. The reason for the privilege is not to protect the client, but to encourage free exchange of information between the attorney and the client and to promote the administration of justice. *State v. Alexander,* 108 Ariz. 556, 503 P.2d 777 (1972). Neither the client nor the attorney can be compelled to disclose these communications against the client's wishes. *IES v. Superior Court,* 44 Cal.2d 559, 283 P.2d 700 (1955); *Fluty v. State,* 224 Ind. 652, 71 N.E.2d 565 (1947); *Ex parte Martin,* 141 Ohio St. 87, 47 N.E.2d 388 (1943). Neither does the defendant in a criminal case waive the attorney-client privilege when she takes the stand to testify in her own behalf:

"To say that the broad protection of [the attorney-client privilege] is not available to a defendant when he takes the stand in a criminal case would entail consequences far more detrimental to the interests of society than does the rejection of the evidence that might be disclosed. When the client, especially one accused of crimes, asks for advice and guidance in the premises, he should be able to speak freely without any fear and in full confidence that what is said by him or to him by his attorney will not be subsequently subject to disclosure if he takes the witness stand during the trial of his case. Any other policy than strict inviolability, unless expressly waived, would seriously hamper the administration of justice, for the client would perhaps refrain from telling the truth or withhold the truth, while the lawyer would be reluctant to give the correct advice and counsel if he

thought it would be subject to disclosure in the event his client took the stand to testify in his own behalf." *People v. Shapiro,* 308 N.Y. 453, 459, 126 N.E.2d 559, 562 (1955).

In the instant case, it is clear that the effect if not the intent of the question was to force the defendant either to waive the attorney-client privilege or to invoke the privilege before the jury. She was thus on the horns of a dilemma—she could waive the privilege which might have resulted in testimony damaging to her, or she could invoke the privilege and lead the jury to believe she had something to hide. In either case, the effect of the questioning was prejudicial to her.

"If it be said that defendant or her counsel could have objected when the defendant was asked these questions as a witness placed upon the stand by the plaintiff (citation omitted), the answer is practical—and that is that a party should not be put upon such onerous horns of a dilemma during a jury trial. In the forensic battlefield of a contested trial, the contrast is striking in the effect on a jury between a witness whose answers are full and frank and a witness who refuses to answer or on whose behalf objection is made—whatever the merit of the basis for such refusal or objection. There is an understandable *rapport* begotten between witness and jury in the one case, while in the other there is a recognizably devastating adverse effect upon the witness' standing before the jury. To render that strategy efficacious which would facilitate the imposition of the dilemma would in most cases mean that the privilege might never remain inviolate. If a contrary rule were sanctioned, what would become of the privileges not alone of patient and physician, but also of client and lawyer, and of penitent and priest . . . ? These ancient and sacred relationships are basic in our society and as such are worthy of judicial safeguard. I deem them too important to warrant ruthless dissipation of that protection." *Vilardi v. Vilardi,* 200 Misc. 1043, 1045–46, 107 N.Y.S.2d 342, 344–45 (1951). (emphasis in original)

*Vilardi,* supra, was a civil case. The rationale is even more applicable in a criminal case where the defendant is being cross-examined by the State.

"[I]n a criminal case liberty is at stake, and the defendant must not be compelled to imperil the same by an appeal to the rule of exclusion, and be left in the attitude of suppressing evidence." *People v. Werner,* 225 Mich. 18, 23, 195 N.W. 697, 698 (1923).

The questioning was error.

### III.  MARITAL PRIVILEGE

Defendant also claims that the prosecutor tried to force her to exercise the marital privilege in front of the jury.

Buster Holsinger, defendant's husband, was incarcerated on death row at the Arizona State Prison. See *State v. Holsinger,* 115 Ariz. 89, 563 P.2d 888 (1977). During cross examination concerning the visit of Gary Cagnina and Wade Arnold after the killing, the defendant was asked the following:

"Q  And he didn't come in and ask for a drink of water?

"A  I don't remember, Mr. Mount. He may have.

"Q  Were you drinking your Tab at that time?

"A  I said I was.

"Q  You were?

"A  Yes. I had it in my hand.

"Q  And so when Gary Cagnina and Wade Arnold come to your door you let them in the house and you had the Tab in your hand?

"A  I cannot remember, Mr. Mount.

"Q  Was it in a glass?

"A  Yes, it was.

"Q  It was?

"A  Uh huh.

"Q  Now, you know Buster could come in here and testify, couldn't he? He's available to testify?"

Defense counsel objected to the question. During a discussion the prosecutor stated:

"MR. MOUNT: * * * the law in Arizona specifically provides that you can ask the question as to whether or not a particular—as a matter of fact, that's the foundational question you have to ask as to whether or not a witness is available to testify, whether the witness on the stand knows he's available to testify. If he says yes, then you can comment on his not being brought into court to testify."

The trial court ruled that the question was improper and precluded further inquiry into the availability of Buster Holsinger as a witness for the defendant.

█ A defendant's marital privilege is violated when a prosecutor comments on the defense's failure to call defendant's spouse as a witness:

"[T]he established principle which permits an inference that the excluded testimony would be unfavorable to the party who suppressed it ought to yield, as being inconsistent with the full exercise of the [marital] privilege." *Bisno v. United States,* 299 F.2d 711, 723 (9th Cir. 1961), (Hamley, J., concurring) cert. den. 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962).

█ The trial court was correct in precluding further inquiry. We assume this error will not be repeated on retrial.

The judgments of guilt are reversed and this case is remanded for a new trial.

STRUCKMEYER, V. C. J., and HOLOHAN, J., concur.