NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

DANIEL RAE WILSON, *Appellant.*

Nos. 1 CA-CR 22-0077
1 CA-CR 22-0078
(Consolidated)
FILED 3-30-2023

---

Appeal from the Superior Court in Maricopa County
No. CR2018-121688-001, CR2018-118176-001
The Honorable Jacki Ireland, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Gracynthia Claw
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Damon A. Rossi
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

---

Judge Angela K. Paton delivered the decision of the Court, in which Presiding Judge Jennifer M. Perkins and Judge D. Steven Williams joined.

---

**P A T O N**, Judge:

¶1          Daniel Rae Wilson appeals his convictions and sentences on one count of aggravated identity theft, ten counts of forgery, and three counts of criminal possession of a forgery device.  He argues the superior court violated Arizona Rule of Evidence ("Rule") 404(b) by admitting alleged propensity evidence.  He further asserts the State engaged in prosecutorial misconduct by introducing that evidence and referencing it in closing argument.  He also challenges the admission of alleged profile evidence.  Finally, he contends the superior court improperly commented on a detective's testimony.  For reasons that follow, we affirm his convictions and sentences.

**FACTS AND PROCEDURAL HISTORY**

¶2          We view the facts in the light most favorable to sustaining the verdicts, resolving all inferences against Wilson.  *See State v. Reaves*, 252 Ariz. 553, 558, ¶ 2 (App. 2022).  A police officer arrived at a parking lot early one April morning to investigate a report of a suspicious vehicle.  There, he found Wilson asleep and alone in the driver's seat of a parked car, which was registered to a female.  After the officer asked for his name and identification, Wilson abruptly sped away.  He soon crashed the car in front of a house, then ran through the neighborhood.  Officers located him hiding inside a shed where they also found numerous credit, debit, and gift cards (collectively, "credit cards") stacked on a shelf.  The shed's owner, M.A., had never met Wilson, and she had not stored any credit cards in the shed.

¶3          When officers searched the crashed car, they found Wilson's wallet, a backpack, two laptops, two keyboards, methamphetamine, and marijuana.  The backpack contained a credit-card embosser, a credit-card encoder, and a chip scanner (collectively, "forgery devices").

¶4          Detective Kim, who specializes in fraud and identity-theft investigations, analyzed the evidence seized from the shed and the car. Wilson was not the legal accountholder for any of the credit cards, but his

name had been embossed on several of them. According to Detective Kim, a person could use the forgery devices to read and remove account numbers from a card's magnetic strip. The person could then encode the numbers and other names onto the magnetic strips of different cards. At that point, the person could make purchases with the card or sell it.

¶5        The State obtained two indictments against Wilson. The first indictment charged him with one count of aggravated identity theft, a class three felony; ten counts of forgery, class four felonies; and five counts of possessing a forgery device, class six felonies. The second indictment charged him with one count each of possessing methamphetamine, a class four felony; possessing marijuana, a class six felony; and criminal trespass in the first degree, a class one misdemeanor. The superior court later granted the State's motions to consolidate the criminal-trespass charge with the first indictment and dismiss the drug-possession counts, which the court refused to consolidate with the other charges.

¶6        At trial, Wilson's counsel conceded in opening statement that Wilson had been trespassing in the shed, that the prosecution could prove the credit cards had been "altered," and that the associated credit card accounts had been "compromised." Although his counsel acknowledged that Wilson had made "mistakes" and "lapses in judgment" that day, he argued the police had likewise made errors and "cut corners" in their investigation, leading to "mental leaps" and "quick conclusions." Based on those asserted deficiencies, he argued that the State would not be able to prove Wilson "knowingly possessed forged cards" and had "the intent to defraud[.]"

¶7        The State presented the testimony of several victims whose account numbers had been encoded on the seized credit cards. The victims verified that they did not recognize the cards or the named financial institutions. Four victims further explained that they had unauthorized transactions on their accounts.

¶8        The State called Detective Kim, who described his investigation. He obtained the information encoded on the credit cards' magnetic strips using a card reader. The financial institutions named on the cards differed from the encoded information. Detective Kim also noticed suspicious features on several of the cards, including "really tight" embossing, "conspicuous" numbers that were "slightly raised," and account numbers embossed on the front that did not match the encoded information.

¶9　　　　On cross-examination, Detective Kim acknowledged that he had not done any "quality control" on the forgery devices and thus did not know whether they worked properly. He had not "brushed them for fingerprints," nor had the police conducted any forensic analysis of the laptops. Further, he never determined who had manufactured the cards, he did not "follow up with the stores or locations where any alleged fraudulent use occurred," and he did not know whether the "cards themselves [were] responsible for those [unauthorized] charges."

¶10　　　　On redirect examination, Detective Kim explained he did not examine the forgery devices for fingerprints because based on his experience, devices that have been touched by multiple subjects, as was the case here, are not typically fingerprinted. And he did not believe fingerprinting was necessary based on the circumstances of the case. He also addressed why he did not conduct any forensic analysis:

> We have a three-year wait for DNA analysis because this is considered a property offense. Again, based on my assessment of what the officers told me and the evidence recovered, I was highly confident in this case and the recovered evidence absent DNA evidence or fingerprints. . . . Our present wait for a forensic search [of the laptops] . . . [is] upwards to 12 months . . . because it's a property offense. I used the judgment based on the evidence at hand. Why would I delay my case[?] Why would I delay justice for the known victims[?] I fully acknowledge that there is a possibility of 100 [victims] . . . as [defense counsel] said. That's true. We don't know because I did not get the forensic tests done. But based on what we had, potentially eight to ten victims—the statute asked for three. Based on my normal practice, we shoot for a goal of five. Under no circumstances would we ever present a case with 100 victims, 50 victims, even two dozen victims. It's cost prohibitive. It's time prohibitive. Again, it was my responsibility and judgment, my assessment. That's what I chose to do.

¶11　　　　The State concluded its redirect examination following that exchange. Once Detective Kim left the stand, the trial judge *sua sponte* instructed the jury:

> There w[ere] questions and answers regarding the value judgment and decisions of Detective Kim. None of that should be considered . . . to determine beyond a reasonable

4

doubt whether the State has proven [the] elements of the offenses. . . . [T]he opinions of police officers or even the opinion of the lawyers or my opinion doesn't mean anything. It's your job.

¶12         After the State rested, the superior court granted Wilson's motion for judgments of acquittal on two forgery-device charges but denied it on the remaining counts. Wilson did not testify or call any witnesses in his defense.

¶13         In closing argument, Wilson's counsel again acknowledged that Wilson trespassed in the shed, the credit cards were altered, Wilson's name was on the cards, "[t]here was fraudulent activity on the victims' accounts," and "[t]he items in the backpack, if operable, could theoretically alter cards." He also argued that Wilson fled and hid from the officers because he had an outstanding arrest warrant. Despite those facts, his counsel maintained that the State failed to prove Wilson "knew that these cards were altered or forged, that [he] had intent to use them unlawfully [or] defraud others, [and that he] was ever in possession of the items found in the backpack." And he assailed Detective Kim's performance in advancing the defense's deficient-investigation theory, arguing that not only could Detective Kim not prove the seized cards were ever used, but he did not reach out to the businesses for potential eyewitness testimony, leaving the "real possibility that the person responsible for the charges" was someone other than Wilson. For the forgery-device charges, Wilson's counsel argued that doubt existed as to Wilson's ownership of the backpack because it was found in a car with a different registered owner.

¶14         In rebuttal, the prosecutor noted that the backpack was in Wilson's "immediate reach," and even though Wilson was not the car's registered owner, he "had some authority to drive the car" and thus had "authority to possess the things that were in the car." He also urged that Detective Kim's decision not to identify the credit cards' user was "immaterial" because none of the charges contained an "element which require[d] [the jury] to determine . . . whether [Wilson had] used those cards sometime in the past."

¶15         The jury found Wilson guilty as described above. The superior court sentenced him to an aggregate term of 15 years' imprisonment. We have jurisdiction to hear his timely appeal under Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") Sections 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

## DISCUSSION

### I.    Asserted Rule 404(b) Violation and Prosecutorial Error

**¶16**    Wilson argues the admission of the victims' testimony recounting the unauthorized transactions on their accounts violated Rule 404(b)'s prohibition on propensity evidence.  He further alleges the State committed prosecutorial error by introducing that testimony and using it in closing argument.  Wilson characterizes the prosecutor's actions as "misconduct" based on his allegation that the prosecutor intentionally misused the challenged evidence.  Because we conclude Wilson has not shown error, we use the term "prosecutorial error," consistent with our supreme court's directive in *Matter of Martinez*, 248 Ariz. 458, 470, ¶ 47 (2020).  Wilson's failure to raise his challenges in the superior court limits our review to fundamental, prejudicial error.  *See State v. Hulsey*, 243 Ariz. 367, 381, ¶ 38 (2018).

**¶17**    Under fundamental-error review, Wilson carries the burden to show trial error exists, the error is fundamental, and the error caused him prejudice.  *See State v. Riley*, 248 Ariz. 154, 170, ¶ 24 (2020).  Trial errors are fundamental when they (1) go to the "foundation of the case," (2) deprive the defendant of "a right essential to his defense," or (3) are "so egregious that [the defendant] could not possibly have received a fair trial."  *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018).

**¶18**    Defendants must make a separate showing of prejudice under the first two fundamental-error categories; errors in the third category are inherently prejudicial. *Id.*  To make such a showing, defendants must establish that "a reasonable jury could have plausibly and intelligently returned a different verdict" absent the error. *Id.* at 144, ¶ 31.  "A reasonable jury is composed of persons of average intelligence and judgment who use common sense" in evaluating the evidence and applying the given instructions. *Id.* (citation omitted).  The "could have" inquiry is objective and demands an examination of the entire record, "including the parties' theories and arguments as well as the trial evidence." *Id.*

**¶19**    Rule 404(b)(1)–(2) bars the admission of evidence of "other crimes, wrongs, or acts . . . to prove the character of a [defendant] in order to show action in conformity therewith" but authorizes its admission for non-propensity purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  Before admitting other-act evidence, courts "must first find that there is clear and convincing proof both as to the commission of the other bad act

and that the defendant committed the act." *State v. Allen*, 253 Ariz. 306, 333, ¶ 57 (2022) (citation omitted).

**¶20**　　　　Here, it is undisputed that the record contains no evidence indicating Wilson made the unauthorized transactions; indeed, Wilson's claim is predicated on this point. None of the victims accused Wilson of the fraudulent purchases, and Detective Kim repeatedly acknowledged that he neither knew nor attempted to discover the perpetrator's identity. As a result, this testimony did not implicate other act evidence. *See* Rule 404(b).

**¶21**　　　　Nonetheless, Wilson asserts the prosecutor improperly insinuated in closing argument that Wilson had, in fact, committed the uncharged acts, citing the following italicized comment in support: "Was [Wilson] knowledgeable about the devices' characters, and did he intend to commit fraud? He clearly knew of the devices' characters. *There's evidence of past fraudulent use by [him]*, meaning his creation of the cards themselves." We disagree, given that the prosecutor immediately clarified that he was alleging Wilson had *manufactured* the cards. Further, the comment occurred within the context of discussing the forgery devices, not the unauthorized transactions. *See State v. Rutledge*, 205 Ariz. 7, 13, ¶ 33 (2003) (explaining that the propriety of a prosecutor's comment depends on the comment's context). Nowhere in the cited comment—or anywhere else—did the prosecutor blame Wilson for *using* the cards to make the fraudulent purchases found on the victims' accounts. Thus, we find no merit to Wilson's complaint.

**¶22**　　　　Wilson also cites *State v. Holsinger*, 124 Ariz. 18 (1979), to support his argument that the prosecutor's conduct entitles him to a new trial. But that case is inapposite here. There, the prosecutor asked a witness whether he knew that the defendant had a "long criminal record" even though the defendant had no such record. *Id.* at 20. Our supreme court found that the question was improper under evidentiary and ethical rules, constituting reversible error. *Id.* at 20–22. Here, no evidence connected Wilson to the fraudulent acts, and the prosecutor never accused him of committing them, let alone hinted at false facts about his criminal history.

**¶23**　　　　Wilson's reliance on *State v. McGann*, 132 Ariz. 296 (1982), is also misplaced. In that case, our supreme court found the admission of other act evidence, namely evidence of other uncharged forgeries involving different victims, was prejudicial, fundamental error because the evidence was critical to the prosecutor's case and founded in hearsay testimony. *Id.* at 298–99. Here, the evidence of the credit card transactions was not critical

to the State's case because none of the charges required proving fraudulent use nor was it introduced as evidence of Wilson's other acts.

¶24  Moreover, Wilson has not shown prejudice.  He contends the admission of the victims' testimony "relieved the State of its burden to prove that [he] knew the nature of the items in the car and intended to use them to defraud."  But he does not explain how the challenged evidence did so, nor does he cite any record evidence to support his claim.  Wilson's sole defense to the forgery-device charges was that he had no knowledge or ownership of them, not that he possessed them for lawful purposes.  And as noted above, the jury was well aware the State could not tie Wilson to the unauthorized transactions.  Accordingly, he has not demonstrated that "a reasonable jury could have plausibly and intelligently" acquitted him had the court excluded the victims' testimony. *Escalante*, 245 Ariz. at 144, ¶ 31; *see State v. Fierro*, 254 Ariz. 35, 41, ¶ 21 (2022) ("The 'could have' standard requires a showing far greater than a metaphysical possibility and necessarily excludes imaginative guesswork." (citation omitted)).

¶25  Finally, because the challenged testimony did not trigger a Rule 404(b) analysis, Rules 401 through 403 governed its admissibility. *See State v. Togar*, 248 Ariz. 567, 573-74, ¶¶ 19, 22 (App. 2020) (noting admissibility is generally assessed under Rules 401 through 403).  Wilson, however, does not argue in his opening brief that the evidence's admission violated the applicable Rules.  Thus, he has waived any such claim of error. *See* Ariz. R. Crim. P. 31.10(a)(7)(A) (Opening briefs must contain "contentions with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies."); *State v. Bolton*, 182 Ariz. 290, 298 (1995) ("Failure to argue a claim on appeal constitutes waiver of that claim.").

¶26  In Wilson's reply brief, he disputes the State's argument on appeal that the evidence was relevant and admissible under Rules 401 through 403.  We need not consider issues an appellant raises for the first time in a reply brief. *See State v. Watson*, 198 Ariz. 48, 51, ¶ 4 (App. 2000).  That said, Wilson makes no attempt to explain how any asserted error was fundamental and prejudicial.  His failure to do so is fatal to his protest. *See Escalante*, 245 Ariz. at 142, ¶ 21; *see also State v. Vargas*, 249 Ariz. 186, 190, ¶ 13 (2020) ("[I]f a defendant simply asserts a general claim of error on appeal and fails to develop it, a court is not obligated to consider it.").  In any event, his counterargument is effectively identical to his argument that the victims' testimony breached Rule 404(b), which we have addressed and rejected.  Wilson is therefore not entitled to relief.

## II.    Alleged Profile Evidence

**¶27**    Citing *Escalante*, Wilson asserts the superior court improperly allowed the State to elicit testimony from Detective Kim that "create[d] a profile of [him] as a person who ran a 'forgery mill.'"  We review his unpreserved claim for fundamental, prejudicial error. *See Escalante*, 245 Ariz. at 140, ¶ 12.

**¶28**    "Describing evidence as 'profile' evidence is a shorthand way of saying that the evidence is offered to implicitly or explicitly suggest that *because* the defendant" possesses "one or more of an informal compilation of characteristics or an abstract of characteristics typically displayed by persons engaged in a particular kind of activity," the jury "should conclude that the defendant must have committed the crime charged." *State v. Haskie*, 242 Ariz. 582, 585-86, ¶ 14 (2017) (citation omitted).  The prosecution is prohibited from offering profile evidence as substantive proof of guilt because it creates a "risk that a defendant will be convicted not for what he did but for what others are doing." *Id.* at 586, ¶ 15 (citation omitted). Nonetheless, "[e]xpert testimony about general behaviors is permitted if helpful to a jury's understanding of the evidence." *Escalante*, 245 Ariz. at 143, ¶ 25.

**¶29**    Detective Kim's testimony explaining the nature and potential uses of the forgery devices did not invite the jury to draw the impermissible inference that Wilson was guilty of the charged crimes because he shared traits with forgery-mill operators.  Instead, the testimony provided context for the jurors and established facts about physical evidence relevant to the forgery-device charges. *See* A.R.S. § 13-2003(A)(1) (criminal possession of a forgery device requires *inter alia* proof that a person made or possessed a device "specifically designed or adapted for use in forging written instruments"); *cf. Escalante*, 245 Ariz. at 143, ¶ 25 (noting qualified officers could permissibly testify that "dryer sheets and coffee beans, like the ones found in [the defendant's] truck, can be used to mask the smell of illegal drugs from police dogs").  At no point did the detective list traits common to forgery-mill operators or link his testimony to Wilson's conduct.  Therefore, Detective Kim's testimony did not constitute improper profile evidence.

**¶30**    Although Wilson contends otherwise, *Escalante* does not support a contrary conclusion.  That case largely turned on whether the defendant possessed a baggie of methamphetamine the police found "in the middle of the road" hours after the defendant's arrest, which "cast[ed] doubt on whether he had discarded the drug." *Escalante*, 245 Ariz. at 143,

¶ 26. No fingerprint analysis was conducted, and DNA testing "revealed nothing" indicating Escalante had possessed the baggie. *Id.* To prove the case, the State introduced drug-courier profile evidence as substantive evidence of guilt that "permeated the trial": "[e]ight officers over three days" explained the "typical behaviors of drug-traffickers," *Id.* at 143, ¶ 27, and their "testimony was only relevant to demonstrate that Escalante's behaviors were consistent with drug trafficking." *Id.* at 142, ¶ 24. Further, in opening statement and closing argument, the prosecutor invited the jury to compare Escalante's behavior to the general behaviors of drug traffickers in reaching its verdicts. *See id.* at 142–43, ¶¶ 24, 27.

**¶31**　　　　Our supreme court concluded that admitting the drug-courier profile evidence constituted fundamental error under prong one because it impacted a "pivotal" factual dispute. *Id.* at 143, ¶ 26. The court further found that Escalante had established prejudice, reasoning "the admissible evidence supporting the prosecution's case on these counts was circumstantial and prompted several questions from the jury about the baggie's ownership." *Id.* at 145–46, ¶ 40.

**¶32**　　　　Unlike in *Escalante*, the alleged profile evidence here did not serve as the "linchpin" of the State's case. *Id.* at 143, ¶ 27. Instead, the prosecutor argued that the credit cards embossed with Wilson's name provided the most incriminating evidence against him. And unlike the baggie's remote location in *Escalante*, the police found the forgery devices in the car where Wilson had been sleeping alone and from which he fled. Further, Wilson's jury did not ask any questions about his possession of the forgery devices, and the superior court instructed the jurors that in reaching their verdicts, they could consider evidence that he fled and hid. Therefore, Wilson has not shown any hypothetical error would have gone to the foundation of the case.

**¶33**　　　　Even assuming arguendo the existence of fundamental error, Wilson has not demonstrated resulting prejudice. Without identifying any record evidence in support, he asserts in conclusory fashion that "[a]bsent th[e] impermissible profile evidence, the jury could have acquitted [him] of at least the Forgery Device counts" because "no testimony at trial revealed that the police found anything inside the backpack . . . that linked [him] directly to its[ ] contents." Not only does Wilson fail to address the other charges, but he does not explain how testimony that the forgery devices could generally be used to alter credit cards—a point he conceded— affected the jury's analysis of whether he possessed those items. Nor does he make any effort to show the challenged testimony impeded his defense to the forgery-device charges, which was disclaiming knowledge and

ownership of the items. Because "[s]peculative prejudice is insufficient under fundamental error review[,]" *State v. Martin*, 225 Ariz. 162, 166, ¶ 15 (App. 2010), his claim fails.

### III. Instruction Following Detective Kim's Testimony

**¶34** Wilson contends the superior court's instruction recounted *supra* ¶ 11 violated the Arizona Constitution's prohibition against judicial commentary on trial evidence. The State counters that in context, the instruction "referred to the detective's opinion about the case's strength and its impact on his investigative decision-making, which were, respectively, improper and irrelevant," and the court properly told the jury to disregard that testimony. As Wilson acknowledges, we apply fundamental-error review to his claim. *See Escalante*, 245 Ariz. at 140, ¶ 12.

**¶35** We agree with the State. "A judge violates Arizona's constitutional prohibition against commenting on evidence by expressing an opinion as to what the evidence proves, in a way that interferes with the jury's independent evaluation of that evidence." *Riley*, 248 Ariz. at 179, ¶ 85 (citation omitted); *see also* Ariz. Const. art. 6, § 27. Here, the instruction neither referred to specific evidence nor conveyed the judge's opinion of what the evidence proved. That the superior court gave the instruction following redirect examination indicates the court's purpose was to alleviate any potential prejudice from Kim's arguably objectionable opinions about the quality of his investigation. *See State v. Trostle*, 191 Ariz. 4, 22 (1997) ("Trial judges are presumed to know the law and to apply it in making their decisions." (quoting *Walton v. Arizona*, 497 U.S. 639, 653 (1990)). Conversely, had the trial judge intended—as Wilson suggests—to communicate to the jury that the judge "assigned no value to [his] line of cross-examination," it is reasonable to infer the judge would have given the instruction immediately after Wilson had finished his questioning.

**¶36** Wilson also has not shown he was prejudiced by the claimed error. Without elaboration or record support, he asserts "[a] reasonable probability existed that, had the court restrained itself, the jury may have found [him] not guilty on some, if not all charges." His conjecture is insufficient to obtain relief under fundamental-error review. *See State v. Dickinson*, 233 Ariz. 527, 531, ¶ 13 (App. 2013) (explaining defendants must "affirmatively prove prejudice" on fundamental-error review).

## CONCLUSION

¶37     We affirm Wilson's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:     AA