724 P.2d 1264

**The STATE of Arizona, Appellee,**

v.

**William Lowery DOGAN, Appellant.**

**2 CA–CR 3662, 2 CA–CR 4145–2PR and 2 CA–CR 4589–3PR.**

Court of Appeals of Arizona,
Division 2, Department A.

Aug. 7, 1986.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Tim Holtzen, Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender by David Lipartito, Tucson, for appellant.

## OPINION

FERNANDEZ, Judge.

Following a two-day jury trial, appellant was found guilty of armed robbery and kidnapping, class 2 felonies, and assault, a class 1 misdemeanor. Appellant was sentenced to concurrent, aggravated prison terms of ten years each on the armed robbery and kidnapping convictions and to a concurrent term of time served (163 days in the Pima County Jail) on the assault convic-

tion. We consolidated review of the trial court's summary denial of relief in two petitions filed pursuant to Rule 32, Rules of Criminal Procedure, 17 A.R.S., with this appeal. We affirm the trial court's rulings.

On December 28, 1983, a Tucson convenience market clerk was robbed. The clerk testified that a young black man whom she had never seen entered the store, walked up and down the aisles, approached the counter and asked to purchase cigarettes, tendered money for the transaction, and then produced what appeared to be a small handgun and demanded "all the money." In removing the money from the cash register, the clerk removed what is known as "bait money," which consists of several bills that, upon removal, trigger a hidden camera. With the gun in his hand, the robber then led the clerk to the back of the store and shut her in the bathroom. When he left the store, she called the police. The responding officers took a description of the perpetrator from the clerk, and the surveillance photographs taken by the hidden camera were distributed through police channels. Two police officers testified that they recognized the person depicted in the surveillance photographs to be the appellant. As part of the robbery investigation, six photographs of black males, including a photograph of appellant, were compiled. The photographic lineup was shown to the store clerk, and she selected appellant's photograph from the array.

Following a *Dessureault* hearing, appellant's motion to suppress in-court or pretrial identification by the clerk was denied. At trial, appellant's motions for a mistrial based on the racial composition of the jury panel and the state's use of its peremptory challenges to strike the only two black venire members were also denied.

Appellant's appeal was stayed pending the trial court's consideration of his petition for post-conviction relief in which he challenged the composition of the jury panel as well as the state's use of its peremptory challenges. The appeal was again stayed pending the trial court's consideration of a second petition for post-conviction

relief in which appellant claimed entitlement to relief based upon newly-discovered evidence related to the *Dessureault* issues and based upon the trial court's use of erroneous information in aggravating his sentence.

## APPLICABILITY OF BATSON V. KENTUCKY

Appellant argues that he was denied a fair trial by an impartial jury because the state used its peremptory challenges to remove the potential jurors of appellant's race from the venire. After the filing of appellant's opening brief in this matter, the United States Supreme Court rendered its decision in *Batson v. Kentucky*, — U.S. —, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), effectively overruling *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), and holding that a defendant can establish a prima facie case of purposeful discrimination in jury selection solely on evidence concerning the prosecutor's exercise of peremptory challenges at his trial. Appellant argues that *Batson* is directly on point and mandates reversal of his conviction.

In appellant's first petition for post-conviction relief, he sought a hearing to place on the record the factual basis of his challenges to the jury selection process, alleging that "the previous record is insufficient for meaningful appellate review ...." The trial judge summarily denied relief and dismissed the petition in an order stating that "the trial records provide a sufficient factual basis upon which the Appellate Court can review ..." and "this issue is still raisable on direct appeal." Subsequently, appellant filed with the court the affidavit of a Pima County Public Defender's Office investigator who identified the black venire members removed from the panel as a result of the state's exercise of its peremptory challenges. We agree with appellant that the record on appeal is insufficient for meaningful appellate review of this issue; however, we do not agree that a reversal is mandated in this case or that appellant is

entitled to post-conviction relief on the issue.

The majority opinion in *Batson v. Kentucky* is silent as to whether *Batson* should be applied retroactively. In the concurring and dissenting opinions, four justices addressed the issue, concluding that *Batson* should not apply retroactively. The Supreme Court has since granted certiorari in two other cases which question the retroactive effect of *Batson*. *United States v. Brown*, 770 F.2d 912 (10th Cir.1985), *cert. granted*, — U.S. —, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986); *Griffith v. Kentucky* (Ky. June 13, 1985), *cert. granted*, — U.S. —, 106 S.Ct. 2274, 90 L.Ed.2d 717 (1986). See also *State v. Jackson*, 317 N.C. 1, 343 S.E.2d 814 (1986) (held *Batson* applies only when jury selection took place after it was rendered).

"There is no constitutional requirement that a judicial decision announcing new constitutional guidelines be applied prospectively or retroactively." *State v. Gerlaugh*, 144 Ariz. 449, 455, 698 P.2d 694, 700 (1985); see also *State v. Hooper*, 145 Ariz. 538, 703 P.2d 482 (1985), *cert. denied*, — U.S. —, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986). To determine whether new constitutional principles should be applied retroactively, we examine (1) the purpose to be served by the new standard, (2) the extent of reliance on the old rule, and (3) the effect on the administration of justice of a retroactive application of the new standard. *Solem v. Stumes*, 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984). Applying those factors, we are persuaded that *Batson* is not to be given retroactive effect. We agree with the analysis set forth in *Batson* by Chief Justice Burger in his dissenting opinion. — U.S. at —, 106 S.Ct. at 1741–1742, 90 L.Ed.2d at 110–111.

The new rule announced by the court in *Batson* is not designed to avert a "clear danger of convicting the innocent." *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416, 86 S.Ct. 459, 465, 15 L.Ed.2d 453, 460 (1966); *State v. Gerlaugh, supra*, 144 Ariz. at 456, 698 P.2d at 701. The *Batson* holding overrules a prior decision

and drastically transforms standard practice, and it is readily apparent that law enforcement authorities and state courts have justifiably relied on the prior standard. See *Solem v. Stumes,* 465 U.S. at 645–646, 104 S.Ct. at 1343, 79 L.Ed.2d at 588–589. Retroactive application of the *Batson* rule would impose a burden on the administration of justice of reassessing cases already decided under the prior standard. We agree with Chief Justice Burger that retroactive application of the *Batson* decision will be a "virtual impossibility." — U.S. at ——, 106 S.Ct. at 1742, 90 L.Ed.2d at 111. We are also persuaded by the fact that the few states which have adopted judicially-created rules similar to that announced in *Batson* have all refused full retroactive application. See *People v. Wheeler,* 22 Cal.3d 258, 283 n. 31, 148 Cal. Rptr. 890, 907 n. 31, 583 P.2d 748, 766 n. 31 (1978); *State v. Neil,* 457 So.2d 481, 488 (Fla. 1984); *Commonwealth v. Soares,* 377 Mass. 461, 493 n. 38, 387 N.E.2d 499, 518 n. 38, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). For these reasons, we will apply the *Batson* rule prospectively only. Thus, as *Batson v. Kentucky* was decided on April 30, 1986, it applies to any trial beginning on or after that date.

## STATE'S PEREMPTORY CHALLENGES

[3] During the jury voir dire, the prosecutor used two of his peremptory challenges to strike the only black venire persons. The defense objected, stating that "there needs to be a showing of some basis for the striking of minority members of the panel when the defendant is of that race," and requested that the court impanel "a new jury with other black people." The trial court denied the request and continued with the trial. Appellant argues that the state's actions constituted an impermissible use of peremptory challenges and resulted in a denial of his right to a fair and impartial jury. We do not agree.

During voir dire, the court excused two venire members who candidly stated that their impartiality was tainted by precon- ceived opinions based on prior experiences with black persons. Subsequently, the court asked the remaining panel members the following question on voir dire: "As you can see, the defendant in this case is black. Is there anyone who feels that because of his race they could not sit as a fair and impartial juror in this case?" To that question, no other panel members responded negatively.

In *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Supreme Court held that the prosecutor's motives for excluding black jurors by peremptory challenge are presumed acceptable. We are bound by that presumption. The issue raised by appellant regarding the state's use of its peremptory challenges was thoroughly discussed by our supreme court in *State v. Wiley,* 144 Ariz. 525, 698 P.2d 1244 (1985). In *Wiley,* the court applied *Swain v. Alabama* and stated, "we will continue to adhere to the Swain rationale that a defendant is not entitled to a new trial unless he is able to show systematic exclusion of an identifiable group." 144 Ariz. at 537, 698 P.2d at 1256. As in *Wiley,* because the appellant here has made no such showing, we find no error.

Our review of the jury selection process in this case leads us to conclude that, under the safeguards of our jury selection system, appellant's right to a fair trial by an impartial jury was not violated. The trial judge during voir dire took steps to assure that the verdict would not be motivated by racial issues. We take this opportunity, however, to reiterate the admonition of our supreme court:

> We remind the state that the duty of the prosecution is to seek justice, not merely to convict.... It is entitled, therefore, not to a jury biased in its favor but to one that will view the evidence fairly and impartially. ... It should use its peremptory challenges toward this end.

*State v. Wiley,* 144 Ariz. at 537, 698 P.2d at 1256.

## RACIAL COMPOSITION OF
## JURY POOL

Appellant also asserts that the Pima County Jury Commissioner's records are maintained in such a way as to make it impossible to determine the racial composition of the jury pool and, therefore, that he is entitled to introduce testimony and statistical evidence to show that black persons are significantly underrepresented on the lists from which jurors are chosen. Jurors in Pima County are selected at random from the county's voter registration list and from a list of all persons in Pima County who are at least 18 years of age and who have been licensed to drive a motor vehicle. A.R.S. § 21–301. Appellant contends that his right to an impartial jury was violated because only two of the 33 persons randomly selected for his venire were black.

To prove a prima facie case of lack of impartial jury selection, appellant must meet the following three-pronged test:

First, defendant must prove that the group allegedly excluded is a distinct class.... Second, the defendant must demonstrate through statistical analysis, 'the percentage of the community made up of the group alleged to be underrepresented, ....' Third, defendant must show that the group was 'systematically excluded' during the selection process.

State v. Bernal, 137 Ariz. 421, 425, 671 P.2d 399, 403 (1983), quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587 (1979). Assuming arguendo that appellant can carry his burden concerning the first two prongs of the test, his contention that the use of voter registration and driver's license lists results in significant underrepresentation of blacks in the jury pool does not show a systematic exclusion of black persons.

Appellant's argument has been discussed and decided adversely by our supreme court in State v. Bernal, supra, and State v. Lee, 114 Ariz. 101, 559 P.2d 657 (1976). At the time of trial of the defendants in Bernal and Lee, juries in Arizona were compiled only through the use of voter registration lists. At the time of appellant's trial, the potential jurors were selected from a list of licensed drivers as well as registered voters. We believe the analyses stated in the Bernal and Lee decisions apply. Our supreme court has stated:

'Mere observation that a particular group is underrepresented on a particular panel does not support a constitutional challenge.... One is not entitled to a jury composed of the exact proportion of one's race which exists in the general population.

*     *     *     *     *     *

'The use of voter registration lists as the sole source of the names of potential jurors is not constitutionally invalid, absent a showing of discrimination in the compiling of such voter registration lists.... Those who do not choose to register to vote cannot be considered a "cognizable group." Their nonregistration is a result of their own inaction; [sic] not a result of affirmative conduct by others to bar their registration.'

State v. Bernal, 137 Ariz. at 426, 671 P.2d at 404, quoting State v. Lee, 114 Ariz. at 103, 559 P.2d at 659. Appellant has not shown systematic exclusion, and no further hearing of appellant's petition for post-conviction relief would result in such a conclusion. We find no violation of appellant's constitutional right to an impartial jury.

## PHOTOGRAPHIC LINEUP

On the date of the robbery, the store clerk described the perpetrator to police officers as a black male, age 27 or 28, five feet seven inches tall, 160 pounds, short black hair, dark brown eyes, very dark complexion and slim build. She stated that he was wearing white sneakers, blue jeans and a blue denim jacket. The clerk apparently never saw the surveillance photographs taken during the robbery by the store's hidden camera. She was shown a lineup composed of six color photographs of black males who fit the description of the robber. The photograph of appellant which was used in the lineup was the only photograph available to police at the time

and showed appellant with his eyes almost closed. In compiling the lineup, the officer selected photographs of other persons with eyelids closed or with peculiarities about the eyes to avoid emphasizing any individual.

■ On defense counsel's motion, the court held an evidentiary hearing pursuant to *State v. Dessureault*, 104 Ariz. 380, 453 P.2d 951 (1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). For purposes of that hearing, the prosecution introduced a black and white copy of the original color photographic lineup. After the detective who prepared the lineup and the store clerk had testified, defense counsel requested that the state present the court with the original color photographic lineup, and the original lineup was admitted into evidence. Counsel argued that the photographic lineup was unduly suggestive in that the appellant "is the most dark complected of the people in the photographic lineup. He's the only one with very short hair." Counsel also argued regarding other physical differences between the appellant and the other five suspect photographs. The court denied the motion to suppress, stating "I don't find any evidence of any suggest[i]bility at all in the testimony." The question of suggestibility is a factual issue, and the determination is within the trial court's discretion. *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983). The photographic lineup in this case displays six black males of similar features and ages. We conclude that the trial court did not abuse its discretion in finding that the photographic lineup from which the appellant was identified was not unduly suggestive. See also *State v. Alvarez*, 145 Ariz. 370, 701 P.2d 1178 (1985).

■ In appellant's second petition for post-conviction relief, he contended that there was newly-discovered evidence regarding the photographic lineup. Specifically, appellant argued that he was the only person depicted in the photographic lineup who was wearing a blue denim jacket. That fact is not "newly discovered." It was merely a fact that was not argued at the *Dessureault* hearing by appellant's trial counsel. Newly-discovered material facts alleged as grounds for post-conviction relief are facts which come to light after the trial and which could not have been discovered and produced at trial through reasonable diligence. *State v. Nettz*, 114 Ariz. 296, 560 P.2d 814 (App.1977). We do not believe that the "discovery" by a different attorney that appellant's photograph was the only photograph in the lineup depicting a person in blue denim constitutes newly-discovered material facts within the scope of Rule 32.1, Rules of Criminal Procedure, 17 A.R.S. (1985 Supp.). Furthermore, Rule 32.10 precludes appellant from relitigating the *Dessureault* issues. Finally, our supreme court has rejected appellant's argument in a case involving similar facts.

■ In *State v. Ware*, 113 Ariz. 340, 554 P.2d 1267 (1976), the victim of a robbery said that the suspect wore a blue denim jacket during the robbery. Police showed him a photographic lineup in which the defendant was the only suspect wearing a blue denim jacket, and our supreme court concluded that the exclusion of the identification was not required. The court pointed out that no testimony was given to indicate that the blue denim jacket played any part in the victim's identification of the defendant. 113 Ariz. at 342–343, 554 P.2d at 1269–1270. Similarly, in this case, the store clerk testified that she had ample opportunity to observe the suspect during the crime, that she got a good look at the robber, that the lights were on in the store, and that she was face-to-face with the robber for at least one minute. There was no testimony to indicate that the blue denim in any way caused her to select appellant's photograph from the lineup. Even assuming for purposes of argument that the identification procedure was unduly suggestive, the totality of the circumstances of this case do not require the exclusion of the identification evidence.

At trial, the detective who investigated the robbery testified that none of the clothing described by the store clerk or depicted

in the surveillance photographs was ever found in appellant's possession. Another police officer testified that no latent fingerprints of a quality suitable for identification were recovered from the scene. Appellant argues that the photographic lineup admitted into evidence at trial insinuated that appellant possessed clothing such as that described by the store clerk, even though the state was unable to introduce evidence to that effect. Citing *State v. Holsinger*, 124 Ariz. 18, 601 P.2d 1054 (1979), appellant argues that it was misconduct for the state to insinuate the existence of evidence which it could not produce. Recently, our supreme court explained that the *Holsinger* rule concerns impeachment of a defendant with evidence of prior conduct in the absence of evidence to prove that conduct at trial. See *State v. Smith*, 146 Ariz. 491, 707 P.2d 289 (1985). We believe the facts in this case are distinguishable from the situations presented by *Holsinger* and *Smith*. We note also that the prosecutor did not argue the fact of appellant's clothing as depicted in the photographic lineup to the jury. Finally, the jury had the surveillance photographs from the hidden camera available to it, as those photographs were also admitted into evidence. Therefore, in addition to the clerk's identification, the jury itself was able to compare those photographs with appellant's physical appearance.

## AGGRAVATION OF SENTENCE

The presentence report which was prepared in this case included a reference to a 1981 Pinal County conviction for which appellant was placed on probation for a period of two years beginning July 20, 1981. At sentencing, defense counsel argued that the offense was an open-ended class 6 felony which had been designated a misdemeanor. The Pima County probation officer who prepared the presentence report stated that he had documentation from Pinal County indicating that the offense was in fact designated a felony. The sentencing judge stated:

I don't think that this case warrants probation. I've looked at your prior back-

ground and the fact that this [was] committed during the time that you were on probation; also, your previous poor response to probation.

I'm not going to go all the way to the aggravated sentencing of 14 years, but I do find certain aggravating factors, or aggravating things that warrant a sentence greater than the presumptive sentence.

The court then sentenced appellant to two concurrent aggravated prison terms of ten years on the armed robbery and kidnapping convictions.

■ In appellant's second petition for post-conviction relief, he submitted the Pinal County sentencing order dated July 20, 1981. That order had been previously appended to the presentence report in this case. The order shows that appellant pled guilty by agreement to the crime of attempted promoting prison contraband, a class 6 felony, "which can be reduced to a class 1 misdemeanor after probation." The order also states: "The record may show that if defendant successfully completes his terms and conditions of probation, this matter may be designated as a class 1 misdemeanor." In the Rule 32 petition, appellant's counsel stated that he personally examined the Pinal County Superior Court records and verified that appellant's conviction in Pinal County had not been designated a felony as of August 7, 1984, the date of sentencing in this case. However, at the time that appellant was sentenced in this case, the sentencing judge had the Pinal County order before him, along with information contained in the presentence report as follows:

On July 20, 1983, when the defendant had made no payments toward the fine, his probation was extended by one year. On July 16, 1984, when there were still no payments made on the fine, a bench warrant was issued. When Pinal County authorities were advised of the defendant's current conviction and incarceration, they added the instant offense to the counts of the Petition to Revoke Pro-

bation, and a probation hold was placed at the Pima County Jail for Pinal County authorities on July 23, 1984. Probation authorities in Pinal County indicate that they intend to take no action on their Petition to Revoke Probation until disposition of the instant charges in Pima County.

Appellant seeks reduction of his sentence to the presumptive term, arguing that the sentencing judge in this case relied on inaccurate information regarding the classification of the Pinal County offense. We will set aside a sentence only when a defendant can demonstrate that false information formed part of the basis for the sentence by showing both that the information before the sentencing court was false or misleading and that the court relied on the false information in passing sentence. *State v. Grier*, 146 Ariz. 511, 707 P.2d 309 (1985).

■ In this case, the judge stated three reasons for aggravating appellant's sentence: his prior background, the fact that the offense was committed while he was on probation, and his poor response to probation. Appellant does not challenge the probation information quoted above, and our review of the presentence report shows that appellant has a history of assaultive and disorderly conduct. The sentencing judge also had before him the petition for revocation of probation which was filed in the Pinal County matter. Based upon the information before the sentencing judge in this case, we do not find that appellant is entitled to a reduction of his sentence or to an evidentiary hearing. The record does not show that the sentencing judge relied on false information in passing sentence, and we find that appellant's sentence was properly aggravated by factors listed in A.R.S. § 13–702. This is not a case in which the felony-misdemeanor classification question resulted in a mandatory enhancement of appellant's sentence, and the judge even commented to appellant that he would have received a 25–year term had the state alleged the offense as a prior conviction.

In addition to the issues raised by counsel and discussed above, we have reviewed the entire record for fundamental error and have found none. Accordingly, appellant's convictions and the sentences imposed are affirmed. The petitions for review are denied.

HATHAWAY, C.J., and HOWARD, P.J., concur.