NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

RUSSELL EUGENE SHIELDS II, *Appellant.*

No. 1 CA-CR 14-0181
FILED 9-24-2015

Appeal from the Superior Court in Mohave County
No. S8015CR201101029
The Honorable Derek C. Carlisle, Judge, *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eliza C. Ybarra
*Counsel for Appellee*

Mohave County Legal Advocate, Kingman
By Jill L. Evans
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Presiding Judge Diane M. Johnsen delivered the decision of the Court, in which Judge Kent E. Cattani and Judge John C. Gemmill joined.

---

J O H N S E N, Judge:

¶1        Russell Eugene Shields appeals his conviction and sentence for second degree murder.  Shields argues the evidence was insufficient to support his conviction.  He further argues the superior court erred when it did not properly respond to a question from the jury, when it refused to order the production of a recording of a witness's "free talk," when it violated Shields's right to confrontation and when it failed to find sentence disparity as a mitigating circumstance for sentencing purposes.  For the reasons that follow, we affirm Shields's convictions and the resulting sentences.

### FACTS AND PROCEDURAL BACKGROUND

¶2        The State charged Shields with first degree murder, Class 1 felony; abandonment of a body, a Class 5 felony; tampering with physical evidence, a Class 6 felony; hindering prosecution, a Class 3 felony; and misconduct involving weapons, a Class 4 felony.  The State alleged alternate theories of premeditated and felony murder and further alleged both principal and accomplice liability.  The jury acquitted Shields of first degree murder but found him guilty of the lesser-included offense of second degree murder.  It also found him guilty of the remaining counts as charged.  The superior court sentenced Shields to an aggravated term of 24 years' imprisonment for second degree murder and concurrent, shorter sentences of imprisonment for the remaining counts.  Shields filed a timely notice of appeal.

### DISCUSSION

¶3        Shields appeals his conviction and sentence for second degree murder, a Class 1 felony.[1]  We have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9, and Arizona Revised Statutes

---

[1]        Shields raises no issues regarding his other convictions or sentences.

("A.R.S.") sections 12-120.21(A)(1) (2015), 13-4031 (2015) and -4033(A)(1), (4) (2015).[2]

## A.      Sufficiency of the Evidence.

**¶4**      Shields argues the evidence was insufficient to support his conviction for second degree murder whether as a principal or an accomplice. Shields contends the evidence was insufficient because his former codefendant, Langan, provided the only direct evidence against Shields and Langan was not credible.

**¶5**      As Shields was charged and as the jury was instructed, a person commits second degree murder if the person, without premeditation: (1) intentionally causes the death of another person; or (2) causes the death of another person knowing his or her conduct will cause death or serious physical injury; or (3) causes the death of another person by recklessly engaging in conduct that creates a grave risk of death and the person does so under circumstances that manifest extreme indifference to human life. *See* A.R.S. § 13-1104(A)(1)-(3) (2015). Further, a person is criminally liable for the conduct of another if the person is an "accomplice" in the commission of the offense, including "any offense that is a natural and probable or reasonably foreseeable consequence of the offense for which the person was an accomplice." A.R.S. § 13-303(A)(3) (2015). An "accomplice" is a person "who with the intent to promote or facilitate the commission of an offense: . . . [s]olicits or commands another person to commit the offense; or . . . [a]ids, counsels, agrees to aid or attempts to aid another person in planning or committing an offense . . . . [or] [p]rovides means or opportunity to another person to commit the offense." A.R.S. § 13-301(1)-(3) (2015).

**¶6**      "Reversible error based on insufficiency of the evidence occurs only where there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996) (quoting *State v. Scott*, 113 Ariz. 423, 424-25 (1976)). "To set aside a jury verdict for insufficient evidence it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support the conclusion reached by the jury." *State v. Arredondo*, 155 Ariz. 314, 316 (1987).

**¶7**      "We construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the

---

[2]      Absent material revision after the date of an alleged offense, we cite a statute's current version.

defendant." *State v. Greene*, 192 Ariz. 431, 436, ¶ 12 (1998). In our review of the record, we resolve any conflict in the evidence in favor of sustaining the verdict. *State v. Guerra*, 161 Ariz. 289, 293 (1989). We do not weigh the evidence, however; that is the function of the jury. *See id.*

**¶8** According to the evidence, Shields was a drug dealer who owed his suppliers $8,000 and was unable to pay his mortgage and risked losing his home. A ledger in Shields's home contained the victim's name alongside a notation of $800. The night of the murder, Shields, Langan, Ellis and others went bowling. Shields had to borrow money from Ellis so he and his girlfriend could bowl. The group later went to Ellis's home. Shields borrowed more money from Ellis later that night so he could pay his mortgage.

**¶9** The murder victim met with people at a motel at approximately midnight that same night. While he was there, the victim received a phone call. After he completed the call, he told the others he had to go "to the other side of the tracks" to "re-up" and buy a quarter ounce of methamphetamine. The victim had approximately $400 when he left. Shields and Langan left Ellis's home together sometime that night. They returned forty-five minutes to one hour later. Shields arrived in a car and Langan arrived on foot. Shields looked like he had "run a marathon" and Langan was pale and threw up in the front yard. Langan carried some clothing he later washed at Ellis's home. Shields also had $400 he did not have earlier. Shields gave that $400 and the other money he borrowed from Ellis to his girlfriend to pay their mortgage.

**¶10** A witness found the victim in a parked car about an hour after the victim had left the hotel to go to "the other side of the tracks." The victim died of a gunshot wound to the upper left chest. The $400 the victim had when he was at the motel approximately one hour earlier was gone. The last call the victim received on his cellphone occurred at 12:18 a.m. and was from a cellphone Shields used. There were other calls between the two cellphones earlier that evening.

**¶11** The State did not call Langan to testify, but Shields called him. Langan testified he and Shields left Ellis's home to meet the victim at Shields's home. Shields and Langan planned to "rough up" the victim and get him "in line" because the victim owed people money. The victim arrived at Shields's home soon after Shields and Langan. Shields and the victim talked in the garage while Langan went to use drugs in a bathroom. Langan heard a shot while he was in the bathroom and re-entered the garage to find Shields apologizing and saying, "I messed up." Langan disassembled the

4

gun Shields used to shoot the victim and they later discarded the components in a field. Investigators found components of a .380 semi-automatic handgun in the field after Langan told them where to search. Shields carried a .380 caliber semi-automatic handgun.

¶12        Shields and Langan loaded the victim's body into the victim's car and Shields cleaned the garage floor. Langan then drove the victim's vehicle to the location where they abandoned it, while Shields followed in his vehicle. They then returned to Ellis's home, where Langan washed his clothes.

¶13        Langan admitted he told a number of different stories about the shooting during his interviews with investigators, including stories in which he portrayed himself as the shooter, but claimed those were all lies he told in an effort to protect Shields. Langan claimed he stopped trying to protect Shields after he learned Shields blamed Langan for the murder.

¶14        The jury watched videos of four separate interviews Shields gave to law enforcement officers. In those videos, Shields ultimately admitted he was present when the murder occurred in his garage, but claimed Langan shot the victim. Shields also admitted he helped clean the scene. Deoxyribonucleic acid ("DNA") obtained from blood on one of Shields's shoes matched the victim's DNA.

¶15        The above evidence was more than sufficient to support Shields's conviction for second degree murder as a principal or an accomplice under any of the three theories charged. That there may have been issues with Langan's credibility is of no matter. "The credibility of witnesses is an issue to be resolved by the jury." *Soto-Fong*, 187 Ariz. at 200 (quoting *Scott*, 113 Ariz. at 425). "Because a jury is free to credit or discredit testimony, we cannot guess what they believed, nor can we determine what a reasonable jury should have believed." *State v. Bronson*, 204 Ariz. 321, 328, ¶ 34 (App. 2003) (quoting *State v. Bass*, 198 Ariz. 571, 582, ¶ 46 (2000)). Further, whether the jury believed any of Langan's testimony is speculation; moreover, Langan's testimony was not necessary to obtain a conviction. Along with Shields's videotaped admissions, the circumstantial evidence was more than sufficient to support the conviction. *See State v. Murray*, 184 Ariz. 9, 31 (1995) ("The probative value of evidence is not reduced because it is circumstantial."); *State v. Burton*, 144 Ariz. 248, 252 (1985) (conviction may be based only on circumstantial evidence).

**B.     The Court's Response to the Jury Question.**

**¶16**           Shields argues the superior court erred by how it responded to a juror's question during deliberations.  The question read, "This question is in regard to what makes an accomplice.  An accomplice to the offense (murder).  If [Shields] cleaned up the evidence, but didn't know [Langan] was going to murder [the victim]; would the cleaning up of evidence make him an accomplice to the offense (murder)?"

**¶17**           The superior court explained to the parties that it could not answer the question "yes" or "no" because it was not a "cut and dried question."  The court noted that Shields could be an accomplice to first degree felony murder as charged if Shields was an accomplice to the robbery or attempted robbery of the victim and in the course of the robbery Langan caused the victim's death.  *See* A.R.S. § 13-1105(A)(2) (2015) (first degree felony murder based on robbery and/or attempted robbery).  This would permit liability even if Shields did not "know" Langan would murder the victim.  The court ruled the accomplice instructions it gave were adequate and ruled it would simply tell the jury to refer to the instructions given.

**¶18**            Shields, however, asked the court to respond, "You'll have to base your decision on the evidence, comma, and on the definition of accomplice, comma, previously presented during the trial. . . .  Something like that."  Shields explained he wanted to "steer" the jury to the accomplice instructions.  The court denied Shields's request.  The court believed Shields's requested response would highlight one instruction over the others and further highlight specific evidence even if it did not constitute a comment on the evidence.  The court believed the question required consideration of all the applicable instructions and not just the accomplice instruction.  The court ultimately referred the jury back to the instructions given.

**¶19**           On appeal, Shields does not assert the superior court erred when it failed to give the response to the jury question Shields requested at trial.  It is only now on appeal that Shields contends the superior court should have responded, "No."

**¶20**           "In general, the decision as to whether and how to respond to a question from the jury is the province of the trial court" and is reviewed for an abuse of discretion.  *Harrington v. Beauchamp Enters.*, 158 Ariz. 118, 121 (1988).  Because Shields did not argue below that the court should have answered "no," we review for fundamental error.  *See State v. Gendron*, 168

Ariz. 153, 154 (1991) (failure to raise an issue at trial waives all but fundamental error). "To establish fundamental error, [a defendant] must show that the error complained of goes to the foundation of his case, takes away a right that is essential to his defense, and is of such magnitude that he could not have received a fair trial." *State v. Henderson*, 210 Ariz. 561, 568, ¶ 24 (2005). Such a defendant must establish both fundamental error and that the error was prejudicial. *Id*. at ¶ 26.

**¶21** There was no error, fundamental or otherwise. The final instructions more than adequately addressed the law of accomplice liability. The instructions informed the jury that to find Shields was an accomplice, the jury had to find he intended to promote or facilitate the commission of the offense and then: (1) solicited or commanded another person to commit the offense; or (2) aided, counseled, agreed to aid or attempted to aid another person in planning or committing the offense; or (3) provided means or opportunity to another person to commit the offense. *See* A.R.S. § 13-301(1)-(3). Shields does not contend the instructions misstated the law or were confusing or misleading. Further, we presume juries follow their instructions. *State v. Dunlap*, 187 Ariz. 441, 461 (App. 1996).

**¶22** Finally, the question was an inartfully worded hypothetical that did not take into account all the facts presented in the case and effectively asked the court to apply the instructions to that hypothetical and tell the jurors if Shields was an accomplice under those facts. It is the jury's function to determine the facts based on the evidence, apply the law given in the final instructions to those facts and determine guilt or innocence. It is not the superior court's function to respond to incomplete "what if" hypotheticals and make determinations for the jury. The superior court did not err when it responded to the question by referring the jury back to the previously given instructions.

## C.     Denial of the Motion to Disclose the "Free Talk."

**¶23** Shields asserts the superior court erred when it denied his motion to disclose the recording of a "free talk" Langan gave to law enforcement officers.[3] The court reviewed the recording *in camera* and held it contained nothing that tended to mitigate or negate Shields's guilt or

---

[3] Shields's argument implies the State refused to produce the recording of the free talk. The State did not disclose the recording because the superior court ordered it did not have to.

reduce his punishment. The court further held Shields failed to demonstrate he had a substantial need for the recording.

**¶24** We review the determination of whether the State must disclose evidence for abuse of discretion. *See State v. Cordova*, 198 Ariz. 242, 244, ¶ 6 (App. 1999). The State must disclose all material information in its possession or control that "tends to mitigate or negate the defendant's guilt as to the offense charged, or which would tend to reduce the defendant's punishment therefor." Ariz. R. Crim. P. 15.1(b)(8); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963). The court may order disclosure of additional materials and information if the defendant demonstrates a "substantial need" for the material for the preparation of the defendant's case, and the defendant cannot "without undue hardship" obtain the material. *See* Ariz. R. Crim. P. 15.1(g).

**¶25** "[T]he obvious purpose of exculpatory evidence is to contradict the Government's evidence against the accused." *United States v. Quinn*, 728 F.3d 243, 262-63 (3d. Cir. 2013). Exculpatory evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "There is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).

**¶26** The superior court did not abuse its discretion when it denied Shields's motion to disclose the free talk. We have reviewed the recording of the free talk and there is nothing in the recording that tends to mitigate or negate Shields's guilt, nor is there anything in the recording that would tend to reduce his punishment. The free talk is consistent with the evidence introduced at trial concerning Shields's involvement in the murder and in some ways is even more inculpatory. There is no reasonable probability that anything in the free talk would have produced a different verdict or resulted in a reduced sentence.

## D. Limitation of the Examination of Langan.

**¶27** Shields argues the superior court interfered with his right to confrontation when it granted the State's motion in limine regarding

Langan's conviction and sentence, when it excluded evidence of the free talk Langan had with law enforcement officers, and when it excluded evidence that Langan had worked as a confidential informant in Texas. We review evidentiary rulings for abuse of discretion. *State v. Amaya-Ruiz*, 166 Ariz. 152, 167 (1990). To the extent those rulings implicate the Confrontation Clause, we review *de novo*. *State v. Ellison*, 213 Ariz. 116, 129, ¶ 42 (2006).[4]

### 1.	The motion in limine.

**¶28**	Langan pled guilty to hindering prosecution and received a sentence of 8.75 years' imprisonment.[5] The State filed a motion in limine to exclude information regarding the length of Langan's sentence and the fact that his conviction was the result of a plea agreement. The superior court granted the motion in limine as to the existence of a plea agreement and the length of Langan's sentence. The court further held, however, that Shields could introduce evidence that Langan had a felony conviction for hindering prosecution.

**¶29**	The superior court did not err in its ruling regarding the manner in which Shields could question Langan about his record. Shields informed the court more than once that he had no objection to the State's motion in limine so long as he could ask Langan if he had originally been charged with murder together with Shields. The court allowed Shields to address this area and noted that the jury already knew Langan had been charged with first degree murder together with Shields because the court read the indictment that named both of them. Having told the court he did

---

[4]	Shields contends "[t]he error deprived [him] of the benefit of the Confrontation Clause of the Sixth Amendment by improperly limiting the cross-examination of the co-defendant/accomplice." Further, all the cases Shields cites address confrontation and cross-examination of prosecution witnesses who testify against the defendant. As noted above, however, the State did not call Langan to testify. Shields did. This was not cross-examination of a witness who gave evidence against Shields on behalf of the State. This was direct examination of a witness Shields himself called to testify.

[5]	Langan did not enter the plea bargain in exchange for his testimony in this case and there was otherwise no "testimonial agreement" with Langan.

not object to the State's motion, Shields may not complain about the ruling on appeal.

### 2.     Exclusion of evidence of the free talk.

¶30          Shields also argues the court erred when it refused to allow him to impeach Langan with evidence that he gave a free talk.[6]  The court did not abuse its discretion.  Shields never sought to ask Langan if he gave a free talk.  Shields sought to ask *a detective* if Langan gave a free talk.  Shields argued this was relevant to Langan's bias and veracity.  The court excluded the questions regarding the free talk as irrelevant *at that time* and of no probative value because Langan had not yet testified.  When Shields ultimately called Langan to testify, Shields never sought to question him about the free talk and we will not speculate that the superior court would have excluded that evidence at that time.

### 3.     Langan's work as an informant.

¶31          In his final argument on this issue, Shields contends the superior court erred when it excluded evidence that Langan had worked as an informant in Texas.  There was no error.  The court admitted evidence that Langan worked with law enforcement as a confidential informant in El Paso, Texas in 2000.

## E.    "Operation Street Sweeper" and the Cross-Examination of Ellis.

¶32          Shields contends the superior court interfered with his right to confront Ellis when it denied his motion to produce records about a law enforcement investigation called "Operation Street Sweeper" and when it limited Shields's cross-examination of Ellis.

### 1.     The motion to produce.

¶33          "Operation Street Sweeper" was a drug investigation that took place in August 2013, more than two years after the murder.  In his motion to produce records from that operation, Shields claimed law enforcement officers either questioned or arrested Ellis as part of that investigation.

---

[6]       Despite Shields's suggestions to the contrary, there was no evidence Langan's free talk was in any way related to the dismissal of the murder charge, the plea agreement he entered into or the sentence he received, nor is there any evidence Langan ultimately received any benefit for the free talk.  Finally, as noted above, there was no evidence of any testimonial agreement between Langan and the State.

Shields, however, offered nothing to support his assertions. The superior court denied the motion and held that any questioning of Ellis in an unrelated investigation two years after the murder was irrelevant and/or that any probative value was outweighed by the danger of confusion.

¶34        The superior court did not abuse its discretion when it denied the motion to produce records from an unrelated investigation that occurred more than two years after the murder. This is especially true in light of the fact that there is no evidence Ellis testified in this case pursuant to any agreement entered into as a result of Operation Street Sweeper or any other investigation, nor is there any evidence Ellis was arrested or charged as a result of that investigation.

### 2.        The cross-examination of Ellis.

¶35        Shields argues the superior court erred when it refused to allow Shields to ask Ellis if he was facing criminal charges at the time of trial. There was no error because the record reveals the court did not exclude that examination. The court expressly told Shields he could ask Ellis if he was facing any criminal charges at that time. Even with the court's permission, however, Shields did not do so.[7] Further, Shields asked Ellis if he was "under a certain amount of pressure from the police right now" and did so without objection from the State. Ellis responded, "Not that I'm aware of."

### F.        Sentencing.

¶36        Finally, Shields argues the superior court erred when it failed to find the disparity between the 8.75-year sentence Langan received for hindering prosecution and the significantly longer sentence Shields would receive for second degree murder was a mitigating factor for sentencing purposes.[8] When a court imposes a sentence within the statutory range, we will not disturb that sentence absent an abuse of discretion. *State v. Jenkins*, 193 Ariz. 115, 121, ¶ 25 (App. 1998).

¶37        The superior court did not abuse its discretion. First, a court need not find a mitigating circumstance simply because there is evidence

---

[7]        We note that to ask a question implying the existence of a prejudicial factual predicate that the examiner cannot support by evidence is unprofessional conduct. *State v. Holsinger*, 124 Ariz. 18, 20-22 (1979).

[8]        Shields waived his right to have a jury determine the existence of aggravating factors for sentencing purposes.

of that circumstance. The court need only consider that circumstance. *Id.* Here, the superior court explained that it considered the disparity between Shields's and Langan's sentences in determining the appropriate sentence for murder. Nothing more was required and that alone defeats Shields's contention. Second, "[a] disparity in sentences between codefendants and/or accomplices can be a mitigating circumstance *if no reasonable explanation exists for the disparity.*" *State v. Kayer*, 194 Ariz. 423, 439, ¶ 57 (1999) (emphasis added). "Only the *unexplained* disparity is significant." *Ellison*, 213 Ariz. at 140, ¶ 105. Here, the superior court held that while it had considered Langan's sentence, it would not consider disparity as a mitigating circumstance because there was an explanation for the disparity. This included the DNA evidence that connected Shields to the murder and the fact that Langan identified Shields as the person who shot the victim. We also note there was evidence the victim was murdered with Shields's handgun and in Shields's garage, that the victim owed Shields $800 and that it was Shields who benefited financially from the victim's death, and that the last call the victim received on his cell phone was from Shields. There was no "unexplained disparity" in sentences.

## CONCLUSION

¶38        We affirm Shields's convictions and resulting sentences.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama

12